Good morning, Your Honors. Kathleen March, Bankruptcy Law Firm. For all of the appellants, that's Key Kavoussi, Iran Kavoussi, Howard Kavoussi, and Pomona Equity Fund. I'll refer to Pomona Equity Fund as P.E.F. by its initials. And of my 20 minutes, I'll talk for 15 minutes and reserve 5 minutes for rebuttal. And one of the clients, Howard Kavoussi, is with me. And I'm going to ask Mr. Kavoussi to speak up and tell me to stop talking after 15 minutes. So I'll reserve 5. This was a state court suit. It was brought by creditor Johnson & Johnson against Dr. Kavoussi, not an appellant. Dr. Kavoussi and his wife, Azita Kavoussi, later filed bankruptcy. After they filed bankruptcy, the summary judgment and other orders in favor of the trustee all have to be reversed for lack of jurisdiction for a very simple reason. The trustee, Chapter 7 Bankruptcy Trustee Howard Ehrenberg, never substituted into the lawsuit. He never became a party to the adversary proceeding. And because he never became a party to the adversary proceeding, there's no jurisdiction to have granted him any relief. The Court cannot grant relief to a stranger, a non-party, to an adversary. Well, he's not exactly a stranger to the proceeding. Looks like he's been here for a good long time. Well, Your Honor, he is a stranger because he never became a plaintiff. He never became a party. Pursuant to Federal Rule of Civil Procedure 25 incorporated by Bankruptcy Rule of Procedure 7025, a motion to substitute in would have been required to add him. Actually, the trustee's counter-excerpt of record, and this is important, at that time, there was never a motion to add the trustee as a party. That shows a recognition that they needed to do that. But they never brought that motion. The Pacer Docket, which is in the Cavusy excerpt of record and cited in our brief, shows there never was a motion to add the trustee, to a party. Now, how the Court gets jurisdiction over people in a lawsuit is they either, the plaintiff either sues, commences the lawsuit, or if somebody is to be added, that party has to bring a motion and be ordered in, be substituted in. There are many cases that say, and they're cited in the opening brief, that say, a stranger cannot be a non-party, cannot be granted relief. So there's a single case that says because there's not a record of a substitution, a party that's actually been appearing for several months, and indeed by now years, is outside the litigation. Well, I mean, suppose the Court had ordered a sanctions order, or ordered attorney's fees against the trustee. Do you think the trustee would have much success saying, oh, never mind, I'm not really here? Well, the trustee might be estopped, but the appellants are not estopped. The trustee pretended to be a party. Why not? Did you object the first time they appeared on the ground that there had been no motion of substitution? No, no, my firm was not the counsel. It doesn't matter who's firm. Your parties and whoever represented them, did they object upon first appearance of the trustee that the trustee could not be a party? Well, I think that the first time they appeared, they did not object upon first appearance of the trustee. And if they did not appear, why would they not appear without getting a motion and an order for an appearance? And if not, why isn't it waived from your side? Because lack of jurisdiction, Your Honor, cannot be waived. And it can be waived at any point. Well, lack of personal jurisdiction can be waived. I mean, if you sue a person and you could make the argument that you didn't have enough contacts with the State of California, but you decide not to, but rather to appear generally in the action, you can waive personal jurisdiction. Well, improper. Not subject matter jurisdiction, but personal jurisdiction, certainly. Somebody not being a personal jurisdiction can be waived. Well, if you're going to adjudicate this, your only complaint isn't about jurisdiction. It's about the failing to file a document that says substitution of parties. I mean, frankly, it seems to me this exalts form over substance in a terrible way, because you acknowledge that they'd be a stop from saying we're not here if, in fact, something went against them. So for practical purposes, they're there. And so what's jurisdictional about this? Judge Clifton, lack of jurisdiction is You're just calling it jurisdiction. What makes it jurisdictional? They're there. You said they could be bound themselves. The fact that they're not a party. They aren't there. The trustee is not there. Rather than suggesting that the appellant should be punished, it's the slightest. Yes, Your Honor. How? By not having the procedures that are required by the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure followed. And how is your client prejudiced by that? In real life, not just in the abstract. We don't have a right to In real life, my firm's client was litigating against the wrong party. But they chose to continue to do that without objecting to the procedure. They didn't choose. They were defendants. They were defending themselves. But they could have raised this issue to the bankruptcy court, the district court, way before this. Right at the beginning and said, wait a minute. This is almost, if it's not waiver on your part, it seems like invited error. Because this was something that could have been fixed in five minutes. Your Honor, lack of standing. It cannot be waived. The trustee doesn't have any standing. The trustee is standing under federal law, section 544, to avoid transfers. I mean, that's the thing. I mean, you're complaining about not the substance of the trustee's ability under law to do this. You're saying if they had just filed this one sheet of paper saying, let me in, and the district court had said, sure, everything would have gone the same way. Well, not necessarily. First of all, I think the trustee is a more favored party than a mere creditor, Johnson & Johnson, in particular, to litigate against the trustee than to litigate against a mere creditor. Which gave your clients incentive to have objected initially if they thought it was a problem, and they didn't do that. Your Honor, the law, the Ninth Circuit law is clear, and we've cited several of the cases that jurisdiction and lack of standing cannot be waived. They can be raised at any point. So the lack of standing, if the trustee had filed this motion to be substituted, and the court had said, sure, the trustee could, as a matter of federal statutory law, could have done the exact same thing that was done, correct? The trustee had standing. Yes or no question. Could they have done it if they had filed this motion that you wanted them to file? That is unclear. We have briefed that we don't believe that the trustee did have standing at all to substitute into an ongoing state court lawsuit under state law brought in state court by a single creditor. And we've briefed that. That's an additional problem here, is that we don't think that the trustee did have standing to substitute into a lawsuit commenced pre-petitioned by a single creditor in state court. And we did brief that. This briefed in the opening brief. But the trustee would have had standing at least to try to move to substitute in. We don't know what would have happened on that motion. And the trustee did not do that. So the trustee did not become a party, Your Honor, Judge Graber, to the adversary proceeding to the lawsuit. And a non-party to a lawsuit lacks standing to be granted relief. That cannot be waived. So the appellants have a right to have these, the summary judgment and the other orders reversed because the trustee never took the steps necessary to become a party. Now, if the trustee had made that motion, and if it goes back down and the trustee does make that motion, you can bet that my firm will be defending that the trustee did not have a right to substitute into a lawsuit commenced in state court pre-petitioned by a single creditor. It sounds like it's being litigated here because, as you say, you presented that as an issue in the case, that there's a substantive, not simply a formal objection, but there's a substantive objection. So maybe you should try to persuade us of that one. The burden of showing that the trustee, if the trustee had made a motion to substitute in, that that motion could have been granted is on the trustee. There is no law that is cited in the appellate brief. Well, I can say that, but I suggest you use your remaining time to actually try to persuade us that you're right, not that the burden falls on one side or the other. This is a state court lawsuit, Your Honor. It was never amended to add any provision of the bankruptcy code. It was brought only under state law, under California Code of Civil Procedure 3439. It was never amended to add any provision of bankruptcy law. So it's not really, Judge Graber, you spoke of Section 544, the so-called strong-arm powers of trustees under the bankruptcy code. Maybe they have them, but they're not alleged in this suit. That was never added. And if I could just have a moment, Your Honor, to ---- While you're thinking, I have another question. No, I'm just turning. Yes, Judge Graber. I have a question. There was a previous appeal in which this Court affirmed the judgment of non-dischargeability, correct? Yes, Your Honor. None of the appellants here were a party to that previous appeal. That was a previous appeal by the debtor, Dr. Tabusi. What is the effect of that case on our analysis here? Well, the effect of that case was, in that case, Johnson & Johnson and trustee at best would be a successor in interest to Johnson & Johnson, a replacement for Johnson & Johnson. The trustee argued in that case that the debt owed to Johnson & Johnson should be held non-dischargeable. And it is. I mean, that's the law. It was held non-dischargeable, okay. But they argued because the financial statement that Dr. Tabusi submitted to Johnson & Johnson was not accurate. That's the same financial statement that the trustee is arguing shows that the stocks, which were actually worthless, the Greater Pacific HMO stock and the SCIPA stock, which shows those stocks were actually worthless. That's what trustee is relying on to support the $4.184 million money judgment that was granted based on the supposed value of those worthless stocks. So there's an estoppel problem. But other than that, since the appellants were not a party to the non-dischargeability appeal, other than the estoppel issue that I just referred to, there is no effect. They weren't parties. It's actually improperly cited by the trustee in the trustee's brief, because the appellants here were not parties. So they're in no way bound by that decision, except for one. It doesn't establish that Dr. Tabusi at least engaged in fraud, because that was the basis of the non-dischargeability. Well, I've looked at the decision, Your Honor, though my clients were not parties. But it was that the financial statements that he submitted to Johnson & Johnson were not accurate. There's the evidence is uncontroverted in this appeal that Dr. Tabusi prepared those financial statements, and that none of the appellants here prepared those financial statements. So there's no way that those financial statements could be turned into fault by the appellants here. They weren't involved in preparing them. And, of course, the loan was many years before the bankruptcy. The bankruptcy was in 2002. The loan was many years before that, and there's no linkage between the financial statements and the $220,000 loan that Pomona Equity Fund made on a secured basis to Dr. Tabusi, which Dr. Tabusi, of course, did use to try and pay Johnson & Johnson, did pay $80,000 of that to continue making payments to Johnson & Johnson. All Pomona Equity Fund did here is what every other bank and mortgage company in America is doing. It foreclosed on its collateral for its $220,000 secured loan when there was a default in paying that loan, period. That's all Pomona Equity Fund did. And there is a party that's entitled summary adjudication. It's not the trustee. Because the California Civil Code section 3439.08E2 expressly precludes purchase of a property in a duly conducted foreclosure sale from constituting a constructive fraudulent transfer. So Pomona Equity Fund, like every other bank and mortgage company in America that forecloses, is entitled to summary adjudication in its favor under the Ninth Circuit Cool Fuel line of cases. Summary adjudication in its favor that P.E.F. purchasing the three property portions at the duly conducted nonjudicial foreclosure sale where it credit bid the $220,000 it was owed, which was, in fact, considerably more than the $184,000 that was the total equity above liens in those three parcels, that Pomona Equity Fund, as a matter of law, did not commit constructive fraudulent transfers. So there is a party that's entitled summary adjudication in its Pomona Equity Fund. In addition, there are two more sections of the fraudulent transfer law which entitle Pomona Equity Fund to retain the property that it purchased. Okay. So you are about three minutes left, if you'd like to reserve your remaining time. Your Honor, there are many issues, and I do want to point out that the ---- We have read your briefs, and we know that things that aren't argued are definitely not waived. We'll consider all of the arguments, even those you haven't had time to mention. Thank you, Your Honor. Good morning. May it please the Court. Let me first pick up on the last ---- State your name for the record. Mark Neubauer for the Trustee and Respondent. Let me first deal with the second issue, the last issue that counsel covered before she left. Pomona Valley Equities was not just another lender. It was a single-purpose entity formed for the sole purpose of lending Dr. Cavussi the debtor $222,000. The source of that $222,000 was a check written by Dr. Cavussi to his parents, which in turn became the capital. It was not a traditional lender. Traditional lenders don't get deeds of trust and sit on them for one year before recording them while the creditors advance more credit to the debtor. So this was, as the district court found in reviewing this file, a collusive scheme to defraud creditors. Let me then turn back to the procedural standing issue, because that certainly constituted the majority of the appellant's comments. There was an order in this case, and it was an order that appears in the excerpts of record at the supplemental excerpts at 11 ---- actually, the supplemental excerpts at 1108. And that is the order approving the employment of counsel for the trustee to pursue and assume these fraudulent conveyance claims. Those are claims that do not belong to a single creditor, but belong to the estate. As the court noted in its comments earlier this morning. And it was not raised in the bankruptcy court. Indeed, to the contrary, counsel for the appellant said specifically on an excerpt of record 2584, acknowledged that the trustee had substituted in. So it is as sort of invited error as the court alluded to. And one reason, and this wasn't discussed in the briefs, for which I apologize, is Federal Rule of Civil Procedure 17A3, which specifically provides a mechanism if a party wants to challenge standing or substitution of a real party in interest to raise an objection and then allow the real party in interest a reasonable time to ratify, join, or be substituted in. Is there an analogy under the bankruptcy is the same? Yes. It's adopted under bankruptcy rule 7017A3. So that opportunity was never provided. And it was, therefore, waived by not being appropriately preserved. But as a practical matter, all the parties dealt with the trustee as the real party in interest, and appropriately so. Because under 544 of Title 11, in fact, the power gives the powers according to the trustee to pursue these claims on behalf of not just a single creditor, but the entire estate, which they did. Section 550 expressly authorizes the trustee to pursue fraud as property of the estate, and it's also discussed in the Ocasio-Cortez case, which we cited to the panel. The cases cited by the appellant do not refute that. Appellant does not have a single case that talks about the standing issue, nor does it have any case that supports its claim that the trustee is not the appropriate person to pursue fraudulent conveyances by the debtor. And that's exactly what happened here. The two cases they cite, the Williams v. California First Bank, had a securities case pursued by the trustee, and that was held to be inappropriate because it was not property of the estate. The second case the appellant cites, In re Folks, dealt with the issue as to whether the creditor or the trustee are appropriate to pursue alter ego claims. And it held, in fact, the trustee was. So turning to what happened, the Court asked about the findings in the debtor's action, which was also before this Court. That dealt with a false statement of a financial statement. But the falsity was not as the appellant claims in terms of the valuation of the property. The falsity, which resulted in the nondischargeability, and the real party in interest pursuing that was the creditor, not the trustee, was that Dr. Cavussi obtained credit by misrepresenting that he owned 100 percent of these properties when, in fact, he had conveyed substantial portions of them, if not all of them, to his family. And one key fact that has never been addressed or dealt with by the appellant at any of the four hearings now we've now had is the transfer of interest that occurred at the initiation of this case, which appears on the excerpts of record at 668. That, after receiving the loan from Johnson & Johnson Finance Company to Pavona Valley Eye Surgery, a wholly owned company by the debtor, Dr. Cavussi, that company wrote a check to appellants Iran and Key Cavussi for $1,050,000 as a loan. That loan was never repaid. And yet, several years later, the debtor, Dr. Cavussi, goes to these two appellants and borrows $1,050,000 from them. He owes him $1,050,000 and supposedly borrows $220,000, for which, as the trail goes on, he subsequently reconveys his interest in three properties, the stock and all his companies. The valuation by the bankruptcy court in not one but two hearings was appropriate. The valuation by the district court of this record was appropriate. And we would urge the Court to reaffirm that position. Go ahead. While you're on the valuation, there are lots of issues here. And one of the issues I had difficulty getting my hands around is understanding the calculations that ultimately led to the judgment amounts. And in particular, so that's the context. I understand. It's difficult for me to wind my way through there, so I don't have time. I have this parade of boxes. And a specific concern that's a sub-part of that, and I'll put it out there and you can choose to address them as you wish, to what extent did that evaluation depend upon the admission that it goes back to the financial statements or the valuations given over to Johnson & Johnson of I think it was $6.2 million. And there was, as you well know, back and forth with regard to what the admission was in the context of litigation. What significance did that admission and the court's interpretation of that admission have in the calculation that was ultimately entered in the judgment? There was no dispute that those properties were worth at least $6.2 million. That was not just in the separate statement of fact, but it was in their briefs as well, where the appellants conceded that the estate had a minimum of $6.2 value at the time of these transfers. Now, just to make sure I understand what you're talking about here, because one of the issues with regard to the admission is whether the admission was to the value or whether the admission was to the statement contained or the financial statement contained that expression of value. When you say that there's no dispute, what is it you're pointing to? What I'm pointing to, it is the financial statement and it is the admission in the record by the appellants that its value is at a minimum $6.2 million. But what the court also looked at was not the values of those assets themselves, but also the value of what was being transferred at the time. In other words, one of the changes in the amounts afforded and assessed against Iran and Kikabusi was the $1,050,000 plus additional transfers and checks. There was throughout the record, and we cited in our brief, it's pretty voluminous, a whole series of checks showing cash transfers from the debtor's estate to the appellants. And it was on that that the court made its calculation. The court made its calculation on the specific check transfers, not just the value of the stock. And then it deducted any repayments and equity that they had initially. In other words, certain of the properties were the real property was partially owned by the appellants prior to the escape. There's a real trail back and forth, and that's one of the reasons why I'm lost in the mud. Let me go back to what seems to be the biggest item, the $6.2 million valuation. Was that used by the court as part of its calculation in the end? Yes. And exactly what is the court's finding? The properties that were transferred were worth $6.2 million. What is that based on? It's based upon their admissions, the financial statements, and the valuations, not just in the financial statements, but in the record you'll see various appraisals of the real property that we provided to the court, various valuations of the stock that they used in financial statements, both of the company itself and of the debtor. And whose financial statements are we talking about here? We would talk about financial statements of Pavonamani Valley Eye Surgery, Greater Pacific Health Maintenance Company, Southern California Physicians, a whole series of doctors. What I'm getting to here is what is it? Is there anything you can put into the mouths of the appellants, as opposed to the debtor, that acknowledges, admits, concedes, stipulates to the valuation of $6.2 million? Yes, because both Howard and Key-Caboose testified, and it's in the record, that they were the bookkeepers, that they prepared the financial statements, that they had powers of attorney for the debtor, that they handled the books and records of the company, that indeed those financial statements were prepared by them. And that was cited to the bankruptcy court from their depositions. So I think when you come full circle, the valuation was carefully determined by the bankruptcy court on a very voluminous record. There's ample evidentiary support, not just from that single financial statement, but from the checks, the various corporate financial statements, and therefore should be upheld. There's also, I'm looking at, I may be mistaken here, but I'm looking at page 2751, which is page 9 of the Order Granting Reconsideration. And there is a statement there that the, there was a statement of undisputed fact, paragraph 31, that's referred to there, that defendants do not deny that Harold's assets were worth $6.8 million. They deny only he was insolvent as a result of the intrafamily transactions. Is that also a proper basis for the valuation? Yes. And before you finish, I would appreciate your commenting specifically on opposing counsel's argument about the impropriety of the trustees intervening in a state court action that involves a single creditor. All right. With respect to that, it was an action that existed pre-bankruptcy. It was brought by the creditor pre-bankruptcy in the state court. Just the day prior to trial, the debtor filed bankruptcy. At that point, in a fraudulent conveyance action, the creditor is not seeking specific assets that were transferred. It's seeking assets, all the assets, because this wasn't, for example, the transfer, the creditor had transferred a piece of real property that they had made unavailable. They had taken everything they owned. This was a simple economic monetary loan. So it would be, in fact, unfair for that state court creditor to get preferential treatment. By operation of law, the trustee who represents all of the creditors is pursuing that asset on behalf of the estate. So what happened was the state court action was removed to the district court and transferred to the bankruptcy court. And at that point, the trustee brought his motion, which was granted by the bankruptcy court, to hire special counsel to pursue this claim on behalf of the estate. So that's why it's appropriate. In fact, to the contrary, it would be inequitable to the administration of an estate to allow individual creditors to pursue fraudulent conveyance claims of this nature, which do not relate to a specific item, but to general insolvency of the debtor, without that being held by the person best to serve all of the creditors equitably, which is the trustee. Unless there are any other questions. No. Thank you very much. No, we have no further questions. Thank you, counsel. And, Ms. March, you do have some rebuttal time remaining. Thank you, Your Honor. An employment order is that the trustee's counsel can be paid from the bankruptcy estate. It doesn't take the place of a motion to substitute in. At the opening brief, to answer your question, Judge Clifton, in the opening brief at pages 15 through 17, we brief the fact that this suit was not brought under 544, never amended to be under 544, and the Ninth Circuit Williams case, which we cite, shows that the trustee could not just become the assignee, which is what the trustee is trying to do, become the assignee of a single creditor and take over a suit commenced pre-petition by a single creditor. So with no amendment of the complaint, the trustee, had the trustee moved to substitute in, could not have been substituted in. That's briefed. The opposing counsel miscites the record. The record is uncontroverted that Dr. Cavussi testified he prepared the financial statements that were submitted to Johnson & Johnson. There's no evidence whatsoever that the financial statements were prepared by the appellants. Your Honor's asked about the math, and by the way, FRCP 17 is a non sequitur. It's just the real party in interest as opposed to suit. You asked about the math, and correctly so. Everybody used the same appraisals. Both sides used the same real property appraisals below. It's uncontroverted that the equity above liens in the three real property portions was $184,000, which is why PEF overpaid by credit bidding the 220 it was owed, which the judge below found was a real loan. She gave a credit of 220 for that loan. It was a real 220 that was loaned. So the calculation, what happened was the judge thought it was 100% of the stock, which was always worthless, but added it up to $4.18 million. Then on the motion to reconsider, it was pointed out it was only half the stock for the HMO. The court had to cut that in half but didn't want to, so the court added in $1,430,000. $1,430,000 was added by the amended judgments, one of which was void because it was after the order was already on appeal, but added $1,430,000 that was not sued on, not sought to be recovered by the complaint, not moved on in the trustee's motion for summary judgment. It was a transfer made by a different Chapter 7 debtor, PVES, that had its own Chapter 7 trustee, which that Chapter 7 trustee had not tried to recover. The trustee never moved to increase the judgment. The only motion was the appellant's motion to alter amend to reduce the judgment. It's inexplicable other than that the judge didn't want to reduce the judgment, and so added $1,430,000, it's inexplicable how that could have been added. But the real problem here is, in addition to that, is that the evidence was really uncontroverted below that the stocks were worthless. Dr. Cavussi prepared the financial statements. They were objected to as being hearsay. That objection was sustained. We briefed that in the briefs. We've also put the site for Dr. Cavussi, the ER site that Dr. Cavussi said he testified under oath. He was the one that prepared the financial statements. All of the evidence was that the GPHMO was failing and that SCIPA was failing, that they didn't have any value. They didn't have any value then. They don't have any value now. $4,184,000. These people can't pay that any more than pigs can fly. These are people that are 70 and 80 years old, and this is ruining their life. And those stocks were always worthless. Thank you, counsel. You've exceeded your time by quite a bit. We appreciate the arguments of both counsel. They've been very helpful. And the case just argued is submitted, and we will stand adjourned. �
judges: Graber, Clifton, Shea